The Chancellor.
This cause is before the court upon exceptions to the master’s report. The questions submitted are involved in some embarrassment in consequence *478 of counsel having brought into the discussion matters which properly belong to the equity reserved. In disposing, however, of the exceptions, I will give my opinion upon the principles which have been discussed, and which must necessarily be determined before the cause can be brought to its final termination. In the opinion heretofore given, which resulted in the reference to the master, which has given rise to these exceptions, there were certain principles settled, which have a bearing upon the present issues, and to which it may be well to refer.
It was determined that, by the will of the testator, it was the residue of the personal estate remaining in the hands of the executors, after the payment of debts and legacies, that they were to invest in real estate; that such investments were to . be made in productive real estate, and that vacant lots were not embraced in the language of the will as such productive estate; that the improvements and repairs upon the real estate were to be made out of the rents and profits,' and not out of the personal estate of the testator. The application of these principles is involved in the decision of the exceptions.
First exception. “ For that the said master, by his report, has charged said John Coryell with the rents and issues which he received, or might have received, from the grist mill property and two brick houses in York street, in Lambertville — whereas the said John Coryell ought not to have been charged with the same at all, either according to the terms of the said decretal order or the principles of equity.”
The objection raised by this exception is not as to the amount charged for the rents of the grist mill, but as to the propriety of making any charge at all against the executor for those rents. And yet it appears to me, that this exception is inconsistent with the position taken before the master, in reference to this property. It was conveyed to the executors, by one of them, John Coryell. It. has *479 been occupied ever since. It was under the superintendence of John Coryell, and there is no allegation, or pretence, that the rent has not been paid by the tenants. The position was taken before the master, and by the counsel of two of the executors, John and Alexander Coryell, on the argument of the exceptions, that the conveyances of the mill property and the two brick houses to the executors were valid conveyances; while, on behalf of the complainant, it was contended that the conveyances were not valid, and not such as should bo sanctioned by the court. The master very properly reported that he did not decide this question. He reported the facts connected with the conveyances, and made a statement of the rents and issues which the properties had yielded since the date of the conveyances in question. He properly reports, that whether the amount, thus ascertained by him, is to stand as a charge against John Coryell, will depend upon the decision of the court as to the validity of the controverted conveyances. I do not understand on what grounds counsel can object to the manner in -which these charges have been made by the master, or as to the propriety of taking any exception, except as to the amount charged by the master. It concludes the party as to the amount, and nothing else; and as to that amount, it is not disputed, and no exception is interposed to its allowance.
But, on behalf of the complainant, it was also argued, that these conveyances ought not to be sanctioned by the court. The question does not properly come up upon the exceptions, but belongs to the equity reserved. It was, however, fully argued, and all the evidence which can elucidate the transaction is before the court. As the litigation is necessarily a protracted one, and the views of this court novo upon the validity of these conveyances may facilitate the parties in the further progress of the cause, I deem it for the interest of all to state the conclusion I have reached.
The will of the testator authorizes his executors, or the *480 survivors or survivor of them, to invest all the residue of his personal estate with whatever interest may have accrued thereon, after paying the legacies specified in the will, in \good productive real estate, at their discretion, as soon after his decease as to them, or the survivors or survivor of them, should seem most to the interest of his estate, and to take deeds for the same in their own name or names, in trust for the benefit of the lawful child or children of his deceased son John, or the survivor of them.
John Coryell was the owner, in fee, of the two brick houses and the grist mill. On the 25th of September, 1853, he conveyed to himself and his co-executors, upon the trust named in the will, the two brick houses, for the consideration of $3500; and on the day following, he conveyed to the same grantees, upon a like trust, the grist mill property, for the consideration of $14,000.
I cannot sanction these conveyances, for the following reasons:
First. They were both made without the consent or co-operation of Asher Reading, one of the executors; and one of them, to wit, 1hat of the grist mill, was made notwithstanding his express dissent and disapprobation. He says, that John Coryell applied to him, and desired him to join with his co-executors in the purchase of the mill property. He refuséd to do so, for the reason, that he did not consider the property worth the price asked for it. He was willing that the property should be purchased for $10,000, provided John Coryell would consent that the consideration money should be credited on the notes and mortgages he owed the estate, and which were then in the hands of Reading; but Coryell would not consent that the consideration money should be so credited. Notwithstanding his dissent and disapprobation of the investment, as proposed, the deed was executed without his knowledge. The conveyance of the two brick houses was also made without the knowledge or consent *481 of Reading. He says lie was not consulted by either of his co-executors, or by any other person, in reference to this investment; and the first he knew of it was upon seeing the deed on the record in the clerk’s office of the county.
The facts present this question — can an investment in real estate be made under this will, except by the joint consent of all the executors ? I think not. The duty imposed upon the executors is an important one. The estate to be thus invested amounts to between seventy and a hundred thousand dollars. The property is to be improved and repaired by the executors, and to remain under their control and management, in all probability, fifteen years or more. It was upon the executors, and the survivors or survivor of them, that the duty was imposed, and not upon a majority of them. Where executors are authorized, by will, to sell and convey real estate, it requires their joint action to carry out the intention and direction of the testator. It is the discretion of oil his executors upon which a testator relies when he authorizes them to sell his real estate. Their joint discretion is equally important where he directs them to purchase real estate for the benefit of some trust which he has created. The same principles which apply in requiring the joint action of executors to sell, must, with equal propriety, be adopted when the duty is imposed upon them to purchase property, and take conveyances. Asher Reading, being one of the grantees, it required his assent before his name could be used in the conveyance. The ordinary functions incident to the office of executor may be exercised by one of several appointed executors, although the others renounce; yet at common law, where a power was given by will to executors to sell land, and one of them refused the trust, it was clear that the others could not sell. Williams on Executors 623; Co. Lit. 113 a. Our statute (Nixon 258, § 19) extends this power to certain cases therein specified.
*482 Second. John Coryell had no right to sell and convey his own property to himself and his co-executors in carrying out the trust under the will. It is within the principles so well established, and of late reaffirmed by this court, in Scott v. Gamble (1 Stockton 218), and by the Court of Errors (Ib. 797), that a trustee cannot be at the same time seller and purchaser. It is inconsistent with the faithful execution of his trust that John Coryell should sell property belonging to him as an individual to John Coryell as executor. Even if both the other executors had consented, the sale would be subject to be affirmed or dis-affirmed at the pleasure of the cestui que trust; or where the cestui que trust is an infant, as in the present case, the court, when the question is directly or incidentally presented, will deal with the conveyances as it shall consider best and most advantageous for the infant.
And lastly, these conveyances cannot be sanctioned by the court, because the circumstances under which they were made cast a shade upon the bona jides of the transaction, and because the investments are not for the interest of the trust estate. The conveyances were made, as already stated, both of them, without the knowledge, and one of them against the advice of one of the executors. The two executors, who did assent, stand in the relationship of father and son, and the property belonged to the former. The grantee was, at the time of the conveyances, indebted to the estate in an amount upwards of twenty-five thousand dollars, and yet he refused to allow the amount of the consideration of these conveyances to be applied in discharge of his indebtedness. The price at which the property was conveyed was extravagant, and much beyond its real value. The evidence establishes, and Asher Reading concurs, that the price at which the properties were conveyed exceeded their fair value at least ¡$5500.
Laboring under all these unfavorable circumstances, and feeling their pressure, an attempt was made to show that the testator, in his lifetime, purchased the mill pro *483 perty for the sum of $14,000, and that the conveyance made to the executors was only a specific performance of an agreement entered into between the testator and Alexander Coryell.
In the spring of 1848, the mill property was offered for sale at public vendue, and was struck off to J. II. Wake-field, as the attorney for John Holcomb, the testator. Mr. Wakefield signed the articles of sale, as such attorney, and nothing further has been heard of that sale, until it was revived in the examination before the master. I am satisfied, from the evidence, that the property was struck off at the sale under a friendly arrangement between John Coryell and Mr. Holcomb, and merely for the accommodation of the former. This conclusion is corroborated by the recent conduct of Coryell. When he solicited his co-executor, Holcomb, to assent to the investment, he did not make the request upon the assumption of the sale and purchase, by the testator in his lifetime, now set up. He had an opportunity also, by his answer, to explain the whole matter, and yet he does not allude to it. It is evidently a mere subterfuge and an afterthought, and ought not to have been resorted to by the executor. At the proper time, I shall decree these deeds to be set aside. There is nothing, however, to correct in the schedule of the master to which this exception refers. The master very properly made up the accounts for the future action of the court, as it might decree for or against the conveyances. The exception, therefore, must be overruled.
Second exception. “For that the said master, by his report, has charged said Alexander Coryell with the rent of the premises known as the brick yard property, conveyed to said estate by said Alexander Coryell — whereas the said estate ought not to have been charged with the sums at all, either according to the terms of said decretal order or the principle of equity.”
The exception is not to the amount charged against Alexander Coryell, but the objection is to any charge at *484 all being made. The objection is not well taken, and simply for the reason, that the master has made no charge by -which Coryell is concluded, except as to the amount. The master reports that he has taken and stated the account because the property now stands in the name of the estate, although the right of the said Alexander Cor-yell to make such conveyance is called in question by the complainant, and remains to be decided by this court. He further states and reports, that in case it should be decided that such conveyance should not stand, a proper allowance should be made to the accountant, for the rents and issues of the property charged against him. Whether these charges shall stand, depends upon the ultimate disposition this court shall make of the conveyance. The master has well reported, and there is no ground for the exception. The same objections exist, against the propriety and validity of the conveyance of the brick yard lot, as against the conveyance of the two hrick dwelling houses and the mill property. It was conveyed to the estate with the- assent of only one of the grantor’s co-executors, and that one the father of the grantor: the grantor was the seller and buyer, — he was selling his own property, desiring to obtain as high a price as possible for it — and he was purchasing as trustee, in which capacity, it was his duty to buy at as low a price as he could; and the price, which constituted the consideration, was extravagant, and much beyond its value. The fair valuation was fifteen hundred dollars. The price fixed for the consideration was $3000. It is not for the interest of the cestui que trust that the conveyance should stand.
In addition to these, there is another reason why the conveyance should not be sanctioned by the court — the property is not productive real estate. It is not within the intention of the testator that investments should be made in such property. The will authorizes the executors to invest in productive real estate. One of the executors *485 conveys to the estate a lot of his own, which is good for nothing but the use of its soil in making bricks. It is not, in any correct sense, productive real estate. It is true it may be made to bring in something to the estate, if the executors see proper to carry on the brick business: and this would seem to be the idea the executors entertain, and that it is within the scope of their authority to buy such property, and then to make it productive by establishing a manufacturing business.
Very much was said,_ upon the argument, in reference to the fact, that the will declares, in express terms, that the investments shall be made in the discretion of the executors; and the right of this court to interfere with that discretion was questioned. It is true the testator has created a certain trust, to be managed under the discretion of his executors. That trust is created for the benefit of the complainant, who is an infant; and that discretion is confided to the executors that the trust may be managed for her benefit. She may question that discretion, and appeal to this court, as the arbiter, to decide whether the discretion conferred upon the trustees has been exercised soundly and honestly. An executor, or trustee, cannot have au authority conferred upon him not in some measure subject to the control of this court. If the testator had declared that the executors should not be subject to the control of this court, the court would disregard such a provision in the will. It is the law which gives to the testator the power of making his will, and the execution of that will must be submitted to the law. It cannot be taken without its control by the caprice of the testator. He might as well say that his executors need not prove his will, as to declare that they might commit a fraud with impunity in executing it. The complainant has a right to have the discretion confided to the executors exercised in a proper, reasonable, and honest manner; and this court cannot be deprived of its proper jurisdiction to see that her rights are maintained and respected. The *486 complainant and her property, are under the protection of the law, and no testamentary injunction can deprive either the one or the other of the benefit of that protection. Cafe v. Bent, 3 Hare 244. The same Chancellor, in Constable v. Constable (6 Hare 409), decided that, where the disposition of a trust estate amongst certain objects is made, by the author of the trust, to depend upon the discretion of the trustee, the Gourt will, in a proper suit, inquire into the manner in which the trust has been administered, and require that such discretion shall be fairly and honestly exercised; and so long as it appears to be so exercised, the court will not deprive the trustee of the discretionary power which he possesses, or assume itself the exercise of that power; but to avoid a repetition of suits, where there is reason to apprehend that the conduct of the trustee may be liable to question, the court may require the discretion of the trustee to be exercised under its view.
In Webb v. The Earl of Shaftesbury, 7 Vesey jr. 480, the testator devised all his real estates in the county of S. to E. A., his heirs and assignees, upon trust, to manage as he should think proper, and out of the rents and profits to pay all rates and taxes, &c., and the charges of repairs, and steward’s, bailiff’s, and game keeper’s salaries and expenses, and all other charges and expenses which he and they should think proper. There were several other trusts in the will committed to the discretion of E. A., the trustee. Among others, he was authorized and empowered, at any time during his life, by deed, to nominate and appoint one or more persons to be a trustee or trustees for all, or any part of the purposes and trusts in the will contained. Lord Elden decided, that, notwithstanding the language of the will, the court would exerercise a control over the trustee in the management of the estate, and as to the appointment of bailiffs, &c., for that purpose, and actually ordered a reference to a master as to the establishment, which the trustee was, by the *487 will, authorized to manage “as he should think proper.” He also decided that a new trustee could not be appointed without the consent of the court — and restrained the appointment of a new trustee, and said that the trustee’s discretion to make such appointment must be exercised in that case under the discretion' of the court.
I will not pursue this matter further, as all these principles are necessarily involved in subsequent proceedings, which must follow before this suit can be terminated.
Third exception. “ For that the said master, by his report, has stated that the amount of the personal estate of the said John Holcomb, which the said John Coryell received, or might by due diligence have received, remaining in the hands of the said John Coryell at the date of the said report, amounts to seventeen thousand one hundred and thirty-five dollars and twenty-eight cents, whereas the said John Coryell ought not, by the terms of the said decretal order or the principles of equity, to be charged with that amount.”
In Schedule 5, the master charges John Coryell with the personal estate of the testator received by him, or which by due diligence he might have received. By Schedule 11, the master allows John Coryell, for debts, legacies, and expenses discharged and paid by him, four thousand two hundred and eighty-one dollars and sixty-four cents. By deducting the latter from the former sum, it leaves the balance of $17,135.28, with which the master has charged the executor. These accounts are all taken in strict compliance with the decretal order; and if the respective charges in Schedule 5 are correct, and the allowances in Schedule 11 are correct, then the balance is correctly struck. If the executor was dissatisfied with any of the items charged against him, or could justly complain of the want of proper allowances, he should have pointed out specifically the items of which he complains. The exceptant must point out, and specify distinctly, the errors. If the party cannot specify the *488 item which is erroneous, he is not entitled to the benefit of his exception. He cannot, by a general exception like this, impose the duty upon the court of examining every item in the accounts, to ascertain its correctness. The balance is correct, if Schedules 5 and 11 are correct, and there are no exceptions filed to anything contained in either of those schedules. The exception is too general, and is not well taken.
Fourth exception. This exception relates to the conveyances made by John Coryell to the estate, and is disposed of with the first exception. The report of the master upon the matter of that exception cannot prejudice the exceptant. If the conveyances are set aside, the charges will fail of course. The report must stand as a future guide to the court.
Fifth exception. This relates to the value of the grist mill. The remarks made upon the fourth exception are applicable, and for the reasons there given, the exception is not sustained.
The sixth exception relates to the grist mill, and has been virtually disposed of with the first exception. It is overruled.
The seventh exception relates to the value fixed by the master upon the brick yard lot, and is disposed of with the second exception.
Eighth exception. “ for that the said master, by his report, has stated and reported that, in making the inquiries and taking the account, he has considered the purchase of the said John Coryell, at the said sheriff’s sale of the aforesaid lot of laud of about seven acres, and the conveyance of a portion thereof to the said three executors, and the building and erecting upon such portion the said four brick houses by the said John Coryell and Alexander Coryell, and a conveyance of another portion thereof, by the said John Coryell and ’William Holcomb, in exchange for the house and lot in Swan street, and the conveyance of said house and lot by said John Cor- *489 yell to the said executors, as transactions and proceedings not authorized by the said John Holcomb, and as matters which, under the order of reference in this cause, he ought not to take into consideration in making up the account directed to be made in and by the said order— whereas the said master ought to have considered the said purchase by said John Coryell at sheriff’s sale, and his conveyance of a portion thereof to the executors, and the erection of the four brick houses thereon, and the exchange of another portion thereof, and the conveyance of the said house and lot on Swan street to the said executors, as proceedings and transactions authorized by the said will of the said John Holcomb, deceased.”
The ninth exception, which must be taken and considered with the eighth, is as follows : “ For that the said master has, in and by his said report, charged the said John Cor-yell with the bond and mortgage belonging to the estate of said John Holcomb, in order to satisfy which, the sheriff of Hunterdon sold the aforesaid lot of land under an execution issued out of said court upon a decree for sale obtained upon a bill of foreclosure filed on said mortgage — whereas the said master ought not to have charged the said John Coryell with the said land and mortgage.”
Among the general property of the testator, was a bond and mortgage, given to him by one John II. Scudder, to secure the sum of twelve hundred and six dollars and thirteen cents. The amount due on the bond and mortgage, at the date of master’s report, was $2721.31. The master charges John Coryell with this sum, the bond and mortgage having fallen into his hands in the apportionment of the estate among the executors. This constitutes the objection to the report, embraced in the ninth exception, and which necessarily follows as the result of the master’s conclusions upon the matters embraced in the eighth exception.
The views of the master, as to the impropriety and illegality of the whole transaction, are correct. I shall not *490 differ with him as to any of the principles which guided him to' his conclusions. The modification, which I shall propose in his report, results from my views in reference to the general interest of the estate.
The executors filed their bill, and obtained a decree on the Scudder bond and mortgage. On the day of sale, finding that the property would not bring the amount of the decree, and considering it for the interest of the estate that the property should be purchased in by them, the three executors, on the 22d of February, 185-3, entered into a writing under their hands and seals, by which it was agreed that the said John Coryell should purchase the mortgage premises at the sheriff’s sale, and take a deed for the same, and hold the land for the benefit of the estate; and should sell it in lots, at such times and upon such terms as a majority of said executors should agree; and that the proceeds thereof should be applied, after paying all expenses, to the benefit of the estate of the said John Holcomb. Under and in accordance with this agreement, the premises were struck off’to John Coryell, and the sheriff made him a deed for the same.
This arrangement was not only not objectionable, but was proper in itself. The executors could not directly become the purchasers at the sale. Some such arrangement was necessary, or else the alternative must be submitted to of a sacrifice of the property. It was a reasonable arrangement, and such as judicious and prudent men would .make in reference to their own property. It is right, therefore, that this court, which may mitigate the rigor of strict law, should regard the transaction with complacency. If the executors had pursued the terms of that agreement, and carried it out in its true spirit, they would have avoided all just censure upon their conduct. Their further disposition of the property was not only a violation of the agreement, but with very much the appearance of bad faith.
On the 2d of March, 1854, John Coryell, with the con *491 sent of his son Alexander, but without the consent, and without consulting the other executor, Asher Heading, conveyed a portion of the land, being a lot of one hundred and twelve feet front on York street, and one hundred and fifty feet deep, to the executors, upon the trust created by the will — that is empowering the executors to invest the personal estate in productive real estate. This conveyance to the executors was illegal, for two reasons —because two executors could not make an investment in fulfilment of the trust without the consent of the other executor, and because they had no right to invest in vacant town lots, such not being productive real estate. Upon this lot, John Coryell and his son expended upwards of $3,600, money of the estate, in erecting four brick dwelling houses. The expenditure was unlawful. It did not come within the meaning or spirit of the trust created by the testator. In authorizing his executors to make suitable and convenient improvements and necessary repairs upon the productive property which he entrusted them to purchase, he did not intend to give them power to purchase building lots, in small villages, and to erect dwelling houses upon them. The expenditure was unlawfully made, for the additional reason that such improvements could not be made without the consent of all the executors.
A small expenditure might properly be made, so reasonable in its character that the executors ought to consent to it, and therefore, in equity, would bo considered as assenting; but an improvement like this — the erection of four dwelling houses — required the action of all the executors. It never could have been the intention of the testator that each one of those executors, upon his individual judgment, should go to work, and expend the estate that he might get into his hands in purchasing such property, and then making upon it such improvements and repairs as he might consider judicious.
On the same day that this conveyance was made to the *492 executors, John Coryell, with the assent of his son, but without consulting Asher Beading, conveyed a portion of the lot purchased at sheriff’s sale to one 'William Holcomb, and in exchange, William Holcomb conveyed to John Coryell a house and lot on Swan street, in the village of Lambertville. On the same day, John Coryell conveyed the house and lot to the estate upon the trust in the will. The transaction is objectionable, and unlawful, because it was an investment made without Asher Beading’s consent. ■
On the 2d of April, 1854, John Coryell, with the assent of his son, but without the consent of Asher Beading, conveyed another portion of the lot (but what quantity the master could not ascertain) to the executors, upon the trust named in the will. The conveyance was unlawful, because it was not such investment in real estate as the executors were authorized to make, and because it was made without the consent of one of the executors.
The question now is — what shall be done in reference to these several transactions? They are unlawful. It does not follow that the court must necessarily annul them. It may deal with them as shall be best for the interest of the estate. The master has considered them all void, and has charged John Coryell with twenty-seven hundred and twenty-one dollars and thirty-one cents, the amount of principal and interest due, at the date of the report, upon the Scudder bond and mortgage.
As the evidence will not justify a conclusion, that, in this transaction, John Coryell or Alexander Coryell acted fraudulently, but rather that their error was one of judgment as to the law and their duty, it would seem to be dealing rather too rigorously with John Coryell to charge him with the full amount of the bond and mortgage, when it is very evident that the mortgaged property was not worth the full amount of the encumbrances. And yet such a course might be justified by the consideration, that • the two Coryells, in disposing of the property in the man *493 ner they have, have rendered the transaction so complicated, as to render it difficult to adopt any other mode that will render the complainant complete justice.
The complainant is an infant, and the court will be studious to protect and secure her rights. If the defendants, by their conduct, have involved the case in such difficulty, that in adjusting the rights of the parties, one of them must necessarily be a sufferer, the imposition must be placed upon that one who has produced the mischief. I can see but one other mode, besides that which the master has adopted, in order to do equity so as adequately to guard the rights and interest of the infant, and at the same time not deal too harshly with John Coryell. The two deeds of the vacant lots, made by John Coryell to the executors, being portions of the seven acre tract, may be set aside. The one on which the four brick dwelling houses have been erected may be valued by the master, and John Coryell charged with that valuation — the other may bo decreed to be held by John Coryell, upon the trust he purchased it, at the sheriff’s sale. The deed of the house and lot purchased by William Holcomb, and conveyed to the executors, may stand — the court considering it a good investment for the infant. The executor, John Coryell, may make his selection, to let the master’s report stand, or to have it modified in the manner proposed. If he accepts the modification, then he must have an allowance made him for $2721.31, instead of being charged with that amount.
The other exceptions are overruled, except as to the particulars to which I shall now refer, and which must be corrected by a further reference.
The master has considered the exceptants bound to collect, and convert into money, all the securities and evidences of debt which came into their hands at the testator’s death, and has made them account for all the securities in this manner. This, I think, is erroneous.
First. The executors were directed, by the will, to pay *494 certain debts and legacies. It is not denied that these have all been promptly paid.
Second. They were to invest the residue of the personal property, with the interest accruing thereon, in good productive real estate, at their discretion, as soon after the testator’s decease as to them should seem most to the interest of the estate.
It is evident that a very large discretion was committed to the executors, as to the time in which they were to make the investment in real estate; and there was great propriety in not limiting them, as to time, in this respect. There is every few years a great fluctuation in the value of real estate, and it was necessary that a discretion, as to time, should be given to the executors, in order that they might discharge advantageously to the estate the duty thus imposed upon them. A mistake in the investment was incurable. They had no right to reinvest, but their investment was permanent. It was the duty of the executors, until such investment could be made, to keep the personal estate at interest upon good security, and they would have been derelict in duty to have acted otherwise. It was not their duty to convert all the securities in their hands into money. If so, then the money must necessarily be kept on hand, unproductive, until invested. This they would not have been justified in doing. And such is the opinion of the master, for he charges them with interest, after what he considers a reasonable time allowed them to invest the money. I think the mistake is here; in ^considering it the duty of the executors to invest in real estate as soon as practicable, and in fixing a period to be considered as a reasonable period for that purpose. The amount to be invested was a large one, and so long as the executors kept the personal estate securely and profitably invested, the court should be cautious in limiting the time within which it was their duty to have invested all the estate.
Where,, then, the personal estate was safely invested on *495 mortgage, the executors were not bound to convert it into money within the time fixed by the master. Upon such securities, it was their duty to collect the interest, and to reinvest that in good security, unless permanently invested by them upon the trust of the will. The time, given by tlie master for the collection and reinvestment of such interest, is ample. At the period of the testator’s death, there was a very large arrear of interest due the estate. The master lias allowed a year and a half for the collection of such interest, and from that time has charged interest. The charge is properly made. But the master, instead of charging them with the principal money, should have charged them with the securities, as they came to tlieir hands by the inventory. As to the promissory notes, and all other debts not properly secured, it was the duty of the executors to have collected them, and made them secure. If by permitting them to remain without security, they afterwards were lost to the estate, it was through tlie negligence of the executors in not properly discharging their duty, and they must he charged with the loss. With regard to such securities, the master has properly charged them with the principal money due upon them, and the interest which with due diligence they might have received. If any loss has accrued, it should have been specified and pointed out to the master, with the cause of it, that he might determine whether such loss was properly chargeable to the negligence of the executors. But there is no complaint, in any of the exceptions, that the master has charged them with any security which, through the insolvency of the debtor, or from any other cause, has been lost to the estate. It is the principle only, adopted by the master, against which complaint is made. If, however, in taking the accounts, there has been any misunderstanding on the part of the exceptants, they may he at liberty to show before the master any losses which had occurred ; and the master must decide whether they ai’e chargeable with such loss.
*496 I deem it proper to notice here an argument, used by counsel, in justification of the executors not collecting in the estate which came into their hands in the shape of promissory notes and like evidences of debt. A large part of the estate of the testator was in such securities, and had been standing for a number of years. It was insisted, that such being the securities upon which the testator intrusted his property, and coming to the hands of the executors as securities approved by the testator, his executors might safely rest upon the j udgment of the testator as their justification in permitting the property so to remain.
This argument finds its complete refutation in the fact, that the executors, as part of their defence in this suit, set up that John Holcomb, during the latter years of his life, was an imbecile old man, altogether incapable of transacting business, and that nearly all his pecuniary matters were managed for him by John Coryell, one of the defendants. John Coryell presents an account against the estate of $11,800, for his agency in attending to the testator’s business. The argument, in his mouth, is nothing more, therefore, but justifying his negligence as executor on account of his negligence as agent.
In connection with this subject, I would remark, that I consider the advance made by the master to John Cor-yell, for his services, a very liberal allowance. At the death of the testator, upwards of twenty-two thousand dollars of his estate was found in the hands of John and Alexander Coryell, and of this amount upwards of $10,000 with no security, and on some of it, as much as ten years’ back interest due, and not less than two years’ interest on any of it.
The master, in stating the accounts, has charged the exceptants with interest upon the whole estate, as it was inventoried, and has not credited the disbursements at the time they were made. This mode of stating the accounts charges them with interest upon money which *497 they had actually disbursed. This is manifestly an inadvertence on the part of the master.
There must be a reference hack to the master to restate the accounts, in accordance with the views here expressed.